# UNITED STATES DISTRICT COURT
for the
Eastern District of California

United States of America )
v. )
FRANCISCO JAVIER BELTRAN ) Case No.
)
)
)
)
Defendant(s) )

**FILED**
Nov 09, 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __Multiple__ in the county of __Kern__ in the
__Eastern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 846, 841(a)(1) and (b)(1)(A) | 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) - Conspiracy to distribute and Possess with Intent to Distribute Methamphetamine and fentanyl - Mandatory minimum of 10 years in prison and a maximum of up to life in prison; or Fine of up to $10,000,000; or both fine and imprisonment; Supervised release of at least 5 years up to life. |

This criminal complaint is based on these facts:
Aee attached affidavit of SA Emily Kift incorporated hereto.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Emily Kift, DEA Special Agent
*Printed name and title*

Sworn to before me as true and accurate by telephone consistent with FRCP 4.1 and 41(d)(3).

Date: **Nov 7, 2023**

_____
*Judge's signature*

City and state: Fresno, CA                Hon. Erica P. Grosjean
*Printed name and title*

PHILLIP A. TALBERT
United States Attorney
KIMBERLY A. SANCEZ
ARIN C. HEINZ
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFFIDAVIT OF SPECIAL AGENT EMILY KIFT IN SUPPORT OF CRIMINAL COMPLAINT | CASE NO. |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT FOR AN ARREST WARRANT**

I, Emily Kift, Special Agent, U.S. Department of Justice, Drug Enforcement Administration (DEA), being duly sworn, state:

**I      AFFIANT'S TRAINING AND EXPERIENCE**

1. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

2. I have been employed as a DEA Special Agent since April 2019. During this time, I completed a sixteen (16) week training academy in Quantico, Virginia. This training included instruction in the investigation of Federal drug violations, including, but not limited to Title 21, United States Code Sections 841, 843, and 846.

3. Currently, I am assigned to DEA Bakersfield Resident Office, in Bakersfield, CA, that investigates major narcotics trafficking organizations operating throughout Kern County and Inyo County, CA.

1

Additionally, I am assigned to the Kern County High Intensity Drug Trafficking Area (KC-HIDTA) Task Force, in which officers and agents from multiple state, local, and federal agencies work together to target major narcotic traffickers operating in the Kern County, CA area.

4. In connection with my duties, I have become familiar with investigations of drug trafficking organizations, methods of importation and distribution of controlled substances. I have conducted and been involved in numerous narcotics investigations regarding violations of the Controlled Substances Act, which is found in Title 21, United States Code, as well as violations of the State of California Health and Safety Code. I have been the case agent for, or have assisted in, narcotics investigations which have led to the seizure of narcotics and arrests of numerous individuals. I have participated in court proceedings for violations of laws concerning controlled substances. As a law enforcement officer, I have participated in electronic surveillance, visual surveillance, search warrants, the use of confidential informants, pen registers, trap and trace, and the use of undercover agents. I have also participated in the debriefing of defendants, witnesses, and others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

5. In addition, I am familiar with narcotics traffickers' methods of operation, including the manufacturing, distribution, storage and transportation of narcotics, and the collection of money which represents the proceeds of narcotics trafficking and money laundering. My current responsibilities include the investigation of Title 21, United States Code, federal drug offenses.

## II  PURPOSE OF AFFIDAVIT

This affidavit is intended to show that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of the investigation of this matter.

6. **Complaints and Arrest Warrants**
   a. This affidavit is submitted in support of a request that a complaint and arrest warrant be issued for Francisco Javier BELTRAN (BELTRAN) charging him with conspiracy to distribute and possess with the intent to distribute heroin and methamphetamine,

2

Schedule I and Schedule II controlled substances, respectively, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (b)(1)(A).

### III   BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

7. I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, my training and experience investigating narcotics traffickers, which includes my discussions with more experienced narcotics investigators, and upon information I believe to be reliable from the following sources:

   a. Oral and written reports about this investigation and other investigations, which I have received from other members of the California Highway Patrol (CHP), Bakersfield Police Department (BPD), Kern County Sheriff's Department (KCSO), Kern County Probation Department (KCPD) as well as other federal agents and state law enforcement agencies;

   b. Physical surveillance conducted by the law enforcement personnel in this and other investigations, which have been reported to me either directly or indirectly;

   c. Intercepted communications made pursuant to prior court orders;

   d. Confidential source statements;

   e. Witness statements

   f. Pen register and trap and trace information, telephone toll records, and subscriber information;

   g. Public records;

   h. Law enforcement databases; and

   i. Evidence gathered through other law enforcement investigations.

6. Except as otherwise noted, when I assert that a statement was made, the information was provided by a BPD Officer, KCSO Deputy, another federal agent, another law enforcement officer, or a source of information (who may have had either direct or hearsay knowledge of the statement), with whom I have spoken or whose reports or statements I have reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own

observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

## IV  PROBABLE CAUSE

### A. Synopsis and Background

8. In or around May 2019, the DEA, CHP, and BPD began an investigation into BELTRAN and the BELTRAN DTO. To date, the DEA has conducted several consensually-recorded calls using numerous Confidential Sources (hereafter referred to as CSs), conducted numerous controlled purchases of narcotics, authored one T-III intercept, several GPS warrant affidavits, applications for pen registers, and employed other various investigative techniques targeting the DTO. During the course of the investigation, investigators have seized approximately 5 pounds of methamphetamine, 1 kilogram of heroin, and 1,400 counterfeit hydrocodone pills (containing fentanyl).

9. CS1 reported to and assisted the DEA in exchange for potential sentencing leniency ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Much of the information provided by CS1 has been corroborated through other sources. Therefore, I believe CS1 to be a reliable source of information. CS1 advised that several years ago, CS1 procured methamphetamine from BELTRAN but has no further information. CS1 was de-activated and ceased assisting DEA Bakersfield in October 2020.

10. CS2 reported to and assisted the DEA for financial benefits. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Much of the information provided by CS2 has been corroborated through other sources. Therefore, I believe CS2 to be a reliable source of information.

11. CS3 reported to and assisted the DEA for judicial consideration ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ CS3 agreed to assist DEA efforts with narcotic investigations in exchange for potential sentencing leniency. CS3 was de-activated and ceased assisting the DEA in March 2021. Much of the information provided by CS3 has been corroborated through other sources. Therefore, I believe CS3 to be a reliable source of information.

12. On March 26, 2020, the Honorable Dale A. Drozd, U.S. District Court Judge for the Eastern District of California, entered an order in 1:20-SW-0096-DAD authorizing pursuant to Title III the interception of the cellular telephones with phone numbers 702-980-7700 and 661-447-0060, both of which were used by BELTRAN.

**B.    May 24, 2019 – BELTRAN Negotiated the Sale of Narcotics to CS2**

13. On May 24, 2019, at approximately 12:11 p.m., at the direction of controlling agents, CS2 called BELTRAN to negotiate the purchase of methamphetamine. CS2 recorded this and subsequent telephone calls between CS2 and BELTRAN on May 24, 2019, and the calls were transcribed. In his first call, CS2 introduced himself to BELTRAN by stating that "Pelon" – a suspected reference to CS1 – "gave me your (BELTRAN's) number." BELTRAN explained that he was in Los Angeles, and that he would "go up there a little later," seemingly referencing that he would travel to CS2's location shortly, which BELTRAN explained would take "about three hours."

14. Shortly afterwards, CS2 called BELTRAN to explain he would need to "reschedule for another week" unless BELTRAN had "someone around here (CS2's location) that would have those girls." BELTRAN stated, "the fucking kid went to Lancaster" and "the girls were right there." BELTRAN then offered, "let me ask someone else there if they can see you." Minutes later, BELTRAN called CS2 back to report, "this kid doesn't answer." BELTRAN told CS2, "Call me next week." CS2 asked BELTRAN, "is it true what he said? 39 for the three girls." BELTRAN replied, "Yes … It's true." BELTRAN then committed to being available to CS2 for a future meeting, stating, "Let me know on Tuesday that way I won't move on Wednesday and I'll wait for you there … I apologize, dude … I already had the things there to give you."

15. Based on my training, experience, conversations with other law enforcement officers and knowledge of this investigation, in the above recorded telephonic communications, I believe that BELTRAN and CS2 are discussing a pending narcotics transaction to include pricing of the narcotics. CS2 explained to BELTRAN that he was coming "for some things…" I believe that this is cryptic language for narcotics. BELTRAN acknowledged the request from CS2 and advised that he (BELTRAN) was in Los Angeles and would not be returning until later that evening. CS2 and

BELTRAN began discussing possible solutions for acquiring narcotics. CS2 asked BELTRAN if there was anyone else that could provide the "girls". BELTRAN stated that there was but "Fucking kid went to Lancaster." Based on my training, experience, and conversations with experienced law enforcement officer, I believe that "girls" is common cryptic language for narcotics. I further believe that when BELTRAN is referring to the "kid", he is talking about a member of his drug trafficking organization that was currently transporting narcotics to Lancaster, CA. BELTRAN explains that he will not be able to return in time from Los Angeles to conclude the narcotics transaction. However, BELTRAN confirmed to CS2 that they will reschedule and confirmed a price of "Thirty-nine (39) for the three girls". Based on my training and experience, I believe "three girls" is cryptic language for three pounds of methamphetamine and "39" is stated in reference to $3,900. Furthermore, I believe BELTRAN is charging CS2 $1,300 per pound of methamphetamine.

### C. July 11, 2019– Controlled Purchase of Five Pounds of Methamphetamine from BELTRAN

16. At the direction of law enforcement, CS2 contacted BELTRAN and negotiated the purchase of five (5) pounds of methamphetamine for $6,500 to take place on July 11, 2019. At approximately 9:57 a.m., BELTRAN and CS2 communicated by telephone, and CS2 told BELTRAN "I have about like 15 minutes to arrive." BELTRAN reported, "Well, it's set, dude … I'll be around." The two confirmed a meeting in Bakersfield, and BELTRAN confirmed the meeting would be at a restaurant near Ming (Avenue).

17. A few minutes later, law enforcement conducting surveillance outside of BELTRAN's residence 6208 Galanos Court, Bakersfield, CA (Beltran's Residence) observed BELTRAN exit the residence with a black and white bag in his hand. Law enforcement followed BELTRAN as he drove from the Beltran's Residence to a shopping plaza near Ming Avenue and park his vehicle.

18. After parking, BELTRAN spoke with CS2 to direct him to the meeting location. Eventually, CS2 recommended that BELTRAN come to his location in the vicinity of a Walmart and Lowe's store. BELTRAN confirmed, "I'm on my way." Immediately following the call, law enforcement

6

observed BELTRAN drive his vehicle to the parking lot of a Walmart/Lowe's near 6200 Colony Street, Bakersfield, and park next to CS2's vehicle.

19. Law enforcement observed CS2 exit his/her vehicle and approach the passenger side of BELTRAN's vehicle. At that time, CS2 provided BELTRAN with $6,500 and BELTRAN provided CS2 with approximately five pounds of a substance that later was confirmed through laboratory testing to be 99% pure methamphetamine.[1] The transaction was audio recorded and DEA personnel took photographs of BELTRAN's vehicle departing the meet location. Law enforcement followed BELTRAN after the meeting until he eventually arrived at the Beltran's Residence.

20. CS2 advised BELTRAN presented him/her with a black and white "Hugo Boss" shopping bag with the suspected methamphetamine. According to CS2, BELTRAN qualified the product by saying it was "good shit." CS2 said that after he/she paid for the suspected methamphetamine, BELTRAN and CS2 spoke about future narcotic deals. CS2 stated that BELTRAN advised he could sell a minimum of three kilograms of heroin for approximately $17,000 a kilogram. Although the audio recording of CS2's meeting with BELTRAN was inaudible in various instances, the recording adequately evidences the terminology used to describe heroin – the specific terminology used during the meet to describe heroin was "morenita," which translates from Spanish to mean "dark stuff." This is a term used commonly by drug traffickers, based on my training and experience.

### D. August 14, 2019- Controlled Purchase of One (1) kilogram of Heroin from BELTRAN

21. At the direction of law enforcement, CS2 contacted BELTRAN and negotiated the purchase of one (1) kilogram of heroin for $18,000 to take place on August 14, 2019. Over a series of recorded telephone calls beginning on or about July 30, 2019, CS2 and BELTRAN discussed various aspects of the anticipated transaction, including meeting location and they type of narcotics to be transacted.

22. For instance, on July 30, 2019, CS2 and BELTRAN spoke by telephone, during which CS2 told BELTRAN, "This guy said that he wants to see one of those 'little girls.'" Based on my training,

---

[1] The only identifiable fingerprints from the packaging materials resolved to an identified but previously unknown person.

7

experience, conversations with other law enforcement personnel, and my knowledge of this investigation, I believe CS2 and BELTRAN were discussing a future narcotics transaction. I believe when CS2 stated, "This guy said that he wants to see one of those little girls", that CS2 was telling BELTRAN "this guy" in reference to his customer and uses the terminology, "little girls" as coded language to describe narcotics, specifically heroin. Based on my training and experience, I know "little girls" to be a term narcotic traffickers often use to describe various kinds of narcotics, in this instance CS2 is referencing heroin.

23. CS2 then referred to the timing of a meeting, stating, "maybe in a week or two weeks I'll go over there ... he wants to see one and see if it gets done." BELTRAN replied, "Oh, for one ... the complete one. The complete one is going, right." Based on my training and experience I know narcotics traffickers often use the term "complete one" to describe a whole kilogram and/or a whole pound that is not broken up into smaller quantities.

24. Approximately one week later (August 6, 2019), CS2 and BELTRAN spoke again about a narcotics transaction. BELTRAN explained, "I was calling you to, to see what day you were going to come down." BELTRAN confirmed, "were you going to need those of shaved ice," but CS2 clarified, "Yes ... of the big girls of the dark ones." BELTRAN elaborated, "you're only ... going to take chocolate?" BELTRAN continued, "some arrived right now and there is very little. ... I have two and they barely arrived and they ... at thirty-two and they leave in a hurry."

25. Based on my training, experience, conversations with other law enforcement personnel, and my knowledge of this investigation, I believe CS2 and BELTRAN were continuing negotiations/arrangements for an upcoming narcotics transaction. During the call, BELTRAN asked CS2, "were you going to need those of shaved ice." Based on my training, experience, conversations with other law enforcement personnel, I know "shaved ice" is terminology used frequently among narcotic traffickers to describe methamphetamine. I believe CS2 then clarified the type of narcotic he wanted to purchase from BELTRAN when he stated, "Yes ... of the big girls of the dark ones." I believe CS2 used "big" to reference a whole kilogram and "dark ones" to reference heroin. Based on my training and experience, I know heroin to be dark in color, and I know narcotic traffickers often uses references to "dark" or objects that are dark (like chocolate) to reference heroin. BELTRAN

8

responded to CS2 stating, "Oh, you're only…going to take the chocolate." Based on my training and experience, I believe during this part of the conversation, BELTRAN realized CS2 wanted to buy heroin (not methamphetamine). I believe BELTRAN used the term "chocolate" as coded language to describe heroin's dark colored appearance. Later in the conversation, BELTRAN repeatedly states "there is very little" at his location. Based on my training, experience, and conversations with other law enforcement personnel, I know that during this time frame there was a shortage of methamphetamine and the prices were rising. When BELTRAN states, "I have two and they barely arrived … at thirty-two and they leave in a hurry," I believe BELTRAN was telling CS2 that upon receiving methamphetamine, it is almost immediately sold for "thirty-two". Based on my training experience, and knowledge of the approximate price of narcotics during this time period, I believe BELTRAN was referring to thirty-two hundred ($3,200) per pound of methamphetamine.

26. On August 14, 2019, law enforcement surveillance units in the area of BELTRAN's residence observed BELTRAN depart in a vehicle at approximately 10:57 a.m. Approximately 15 minutes later, CS2 placed a recorded phone call to BELTRAN advising that he/she got off at the Taft exit by the Jack in the Box. CS2 stated BELTRAN was hesitant on meeting at the agreed upon location. At approximately 11:55 a.m., surveillance was established in the area of State Route 99 and State Route 119. Surveillance was established in order to observe the pre-arranged transaction between CS2 and BELTRAN.

27. Around this same time, CS2 and BELTRAN engaged in two telephone conversations during which they discussed a location for the heroin transaction, ultimately agreeing on a "lunch trunk" named "Mariscos El Sinaloa." When BELTRAN stated, "I am on the street. This street is ugly. Do you like it here," CS2 responded, "There is some guys here washing cars but they are on the side." BELTRAN then stated, "Is because there is the office of those fuckers just down there." Based on my training, experience, conversations with other law enforcement personnel, and my knowledge of this investigation, I believe CS2 and BELTRAN were attempting to locate each other in order to complete the narcotics transaction. I believe that when BELTRAN referenced "ugly," he was referring to law enforcement as there is a CHP office near the meet location.

9

28. At approximately 12:27 p.m., law enforcement observed BETRAN's vehicle arrive and park in the area of a gas station near 2106 Taft Hwy, Bakersfield, CA. BELTRAN was observed entering CS2's vehicle, which then drove and parked next to BELTRAN's vehicle, at which point BELTRAN exited CS2's vehicle, entered his vehicle briefly, and then exit carrying a large brown grocery-style paper bag, which BELTRAN placed in the passenger side of CS2's vehicle. Afterwards, BELTRAN departed the area.

29. Shortly afterwards, BELTRAN called CS2 and stated, "It looks powdery because it is dry. They leave it dry because people don't want it gummy, they don't want that shit. ... You are going to like it." immediately following the heroin transaction.

30. Based on my training, experience, conversations with other law enforcement personnel, and my knowledge of this investigation, I believe CS2 and BELTRAN were talking about the quality of the heroin that BELTRAN had sold to CS2. I believe that BELTRAN was referring to the consistency of the heroin when he used terms such as "powdery, "dry" and "gummy."

31. The heroin purchased by CS2 was laboratory tested and confirmed to be a substance of approximately one kilogram of 44% pure heroin. Although two fingerprints suitable for identification were developed on the packaging of the heroin, neither fingerprint was that of BELTRAN.

### E. February 20, 2020- Controlled Purchase of approximately 1,000 counterfeit oxycodone pills containing fentanyl from BELTRAN

32. On or about January 29, 2020, BELTRAN contacted CS3 and asked to meet with him at a Bakersfield restaurant. CS3 thereafter met with BELTRAN, and later reported to law enforcement that the two discussed BELTRAN's narcotics trafficking activities. Among other things, BELTRAN reportedly told CS3 that he worked with a narcotics distributor that could supply large quantities of counterfeit oxycodone pills.

33. At the direction of law enforcement, CS3 thereafter contacted BELTRAN and negotiated the purchase of 1,000 counterfeit oxycodone pills (containing fentanyl) for $5,000, to take place on February 20, 2020.

10

34. At approximately 3:25 pm, CS3 contacted and advised BELTRAN to meet at 5303 Olive Dr., Bakersfield, CA to conduct the narcotic transaction. Shortly afterwards, law enforcement observed BELTRAN arrive at the location in a vehicle he had driven to the August 14, 2019, heroin transaction described above.

35. CS3 approached BELTRAN's vehicle and a short time later, returned to his own vehicle. contacted BELTRAN from the passenger side of the Jeep. A short time later, CS3 returned to his/her vehicle. Law enforcement then followed BELTRAN after he departed and ultimately arrived at Beltran's Residence.

36. CS3 provided law enforcement with a plastic bag he obtained from BELTRAN during the transaction, which was searched and found to contain a large number of small blue pressed pills, imprinted with "M" on one side and "30" on the other. CS3 advised BELTRAN provided CS3 with the pills, in exchange for the $5,000. CS3 advised CS3 told BELTRAN "If this is good, we will do a lot of business together." CS3 stated that BELTRAN replied with "Yes, if this goes good, I can front you whatever." CS3 advised that BELTRAN was referring to various types of narcotics.

37. The pills were laboratory tested and confirmed positive for presence of fentanyl.

### F. March 26, 2020 - Initiation of Title III Wiretap on Two of BELTRAN's Telephonic Devices.

38. On March 26, 2020, the Honorable Dale A. Drozd, U.S. District Court Judge for the Eastern District of California, signed order 1:20-SW-0096-DAD authorizing the interception of the following devices:

   a. Target Telephone #1 702.980.7700, a cellular telephone bearing International Mobile Subscriber Identity (IMSI) 310260061366983; International Mobile Equipment Identity (IMEI) 355292105255990, believed to be utilized by Francisco Javier BELTRAN, and subscribed to "CARLOS TONTO" with a billing address in Bakersfield, California.

   b. Target Telephone #3 661.447.0060, a cellular telephone bearing International Mobile Subscriber Identity (IMSI) 310150726495342, believed to be utilized by Francisco Javier BELTRAN, and subscribed to "JAVIER BELTTRAN" with a billing address in Bakersfield, California.

### G. April 7, 2020- Controlled Purchase of approximately 400 counterfeit oxycodone pills (containing fentanyl) from BELTRAN

39. At the direction of law enforcement, CS3 contacted BELTRAN and negotiated the purchase of 400 counterfeit oxycodone pills (containing fentanyl) to take place on April 11, 2020. CS3 advised BELTRAN the narcotics were intended for a third party (who, in fact, was a DEA undercover officer). Prior to conducting the controlled purchase, surveillance was established at BELTRAN's residence.

40. On April 7, 2020, at approximately 11:31 a.m., CS3 and BELTRAN spoke about a narcotics purchase, and BELTRAN informed CS3 he was still in Los Angeles and he was going to have "them" count them and would call CS3 back. Approximately 45 minutes later, BELTRAN called CS3 to report that he was returning from Los Angeles. GPS location data for BELTRAN's cell phone indicated the device was moving northbound through the Los Angeles area.

41. At approximately 1:53 p.m., BELTRAN contacted CS3 and stated he was going straight to the meet location and asked CS3 to meet him at La Carreta (a business located in Bakersfield).

42. At approximately 2:15 p.m., law enforcement observed a blue Mercedes SUV pull into the driveway of BELTRAN's residence. The driver (later confirmed to be BELTRAN) remained inside the vehicle, while a teenage boy walked from the residence to the driver's side of the Mercedes. Immediately afterwards, BELTRAN called CS3 and asked if he/she was there. CS3 confirmed and stated they were waiting on him (BELTRAN). BELTRAN told CS3 he was on his way. Thereafter, law enforcement observed the Mercedes back-out of the driveway and depart the area. Law enforcement surveillance followed the Mercedes as the car pulled into the La Carreta parking lot.

43. After arriving at the meeting location, BELTRAN called CS3 and confirmed his arrival. CS3 and the undercover officer walked to BELTRAN's vehicle and greeted him. After the introductions were made, the undercover officer observed BELTRAN hand CS3 a clear baggie containing a large amount of blue pills, which CS3 handed to the undercover officer. After inspecting the baggie, the undercover officer gave BELTRAN $2,000.

44. After the conclusion of the meeting, surveillance units followed BELTRAN until he arrived at his residence in Bakersfield. The pills that BELTRAN sold to the undercover officer were laboratory tested and confirmed to contain fentanyl.

### H. Negotiations for 10,000 counterfeit oxycodone pills from BELTRAN

45. Beginning on April 7, 2020, the DEA undercover officer that purchased approximately 400 pills from BELTRAN began communicating with BELTRAN about transacting 10,000 counterfeit oxycodone pills and two kilograms of heroin. As described in more detail below, BELTRAN agreed to provide the narcotics and preliminarily agreed to conduct the transaction in Las Vegas, Nevada, on April 16, 2020.

46. In furtherance of the transaction, court-authorized electronic surveillance revealed BELTRAN made several phone calls in an attempt to procure narcotic couriers. For instance, on April 10, 2020, Johanna VILLA-VARGAS (VILLA-VARGAS) contacted the DEA undercover officer and explained she was calling on behalf of BELTRAN. VILLA-VARGAS explained BELTRAN felt more comfortable transmitting it (presumably the 10,000 pills) via U.S. mail.

47. Two days later, on April 12, 2020, BELTRAN contacted VILLA-VARGAS and appeared to discuss pricing for the 10,000 pills under negotiation. During the conversation, BELTRAN mentioned that he still had to pay the "mule," which your affiant believes based on her training and experience to be a reference to a drug mule (to transport the 10,000 pills).

48. Several days later, on April 15, 2020, BELTRAN contacted Diego CALDERON (CALDERON) and attempted to recruit CALDERON to "run an errand for him (BELTRAN) to Las Vegas." BELTRAN advised CALDERON he would give him (CALDERON) $6,000 to transport 10,000 "fake ones" (pills) to Las Vegas, and to bring $70,000 back from Las Vegas. CALDERON advised he would ask "OSVALDO" if he "was willing to do it." CALDERON advised he would call BELTRAN back.

49. Less than 30 minutes later, BELTRAN made an additional call to an unknown male (UM6239) in another attempt to find another "runner." UM6239 advised he would attempt to find a "runner" if BELTRAN would pay the "runner." BELTRAN claimed he would pay the "runner" "5." Based on

13

my training, experience, and knowledge of this investigation, I believe BELTRAN used the term "5" to describe $5,000. UM6239 advised he would ask around and try to find someone, but was not sure who to ask. BELTRAN advised he would call UM6239 back.

50. Immediately after talking with UM6239, CALDERON called BELTRAN back. CALDERON reported that "OSVALDO" had agreed and "OSVALDO" was going to be accompanied by another "friend." CALDERON advised he would pay "OSVALDO" $3,000 and pay the "friend" $1,200 from the $6,000 BELTRAN was going to provide CALDERON. BELTRAN and CALDERON agreed to meet later.

51. The following day (the date set for the transaction), BELTRAN called VILLA-VARGAS and advised he had "backed out." BELTRAN claimed the purchaser (the undercover officer) was "too demanding and in a hurry," and that BELTRAN did not like it." Additionally, BELTRAN advised her, "the price was good," but that he was sacred.

52. Ultimately, BELTRAN decided not to travel or send the narcotics via a "runner" to the Las Vegas area for the transaction. According to telephonic calls with CS3, BELTRAN claimed he (BELTRAN) would leave the 10,000 in Bakersfield for CS3 to pick up and provide to the customer (undercover officer), but he (BELTRAN) would not travel to or send the narcotics to Las Vegas.

## V   REQUEST TO SEAL

I further request that the Court seal all papers submitted in connection with this Affidavit, except that copies may be maintained by the U.S. Attorney's Office and may be served on counsel for the defendants, Special Agents and other law enforcement officers and federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such law enforcement officers, as needed. These documents pertain to an ongoing criminal investigation that is neither public nor known to all of the targets of this investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize this investigation, and better ensure the safety of agents and the general public at the time the search and arrest warrants are executed.

## VI        CONCLUSION

53. Based on my training, experience, and the information contained within this affidavit, I believe there is probable cause that Francisco Javier BELTRAN conspired with others, to distribute and possess with the intent to distribute at least 1 kilogram of a mixture and substance containing a detectable amount of heroin, at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine and 50 grams of actual methamphetamine, and at least 400 grams of a mixture and substance containing a detectable amount of fentanyl, Schedule I and II controlled substances, in violation of Title 21, United States Code, Sections 846, 841(a)(1); (b)(1)(A).

///

///

Emily Kift, DEA Special Agent
Drug Enforcement Administration

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed.R.Crim.P 4.1 and 41(d)(3) on __November 7__ 2023.

Honorable Erica P. Grosjean
United States Magistrate Judge
Eastern District of California

Reviewed and approved as to form and substance:
/s/ *Arin C. Heinz and Kimberly A. Sanchez*
KIMBERLY A. SANCHEZ
ARIN C. HEINZ
Assistant United States Attorney